# UNITED STATES DISTRICT COURT

### for the
### Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) 1st Amended |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) Case No. 8:21-MJ-00294 |
| Cabinet A7, located at the U.S. TelePacific Corp dba TPx Communications Datacenter at 2001 East Dyer Road, Santa Ana, California 92705 | ) ) ) ) ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, Zachary E. Stegenga, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 26 U.S.C. §§ 7201 and 7202 | See Attachment |
| 18 U.S.C. §§ 371, 664, and 669 | |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of 30 days is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Zachary E. Stegenga
*Applicant's signature*

IRS-CI –SA Zachary E. Stegenga
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.
Date: _____

_____
*Judge's signature*

City and state: <u>Santa Ana, CA</u>

Hon. John D. Early, U.S. Magistrate Judge
*Printed name and title*

AUSA: G. Staples (213) 393-7795

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

I, Zachary E. Stegenga, being duly sworn, depose and state:

## BACKGROUND AND EXPERIENCE OF AFFIANT

1. I have been a Special Agent with the Internal Revenue Service, Criminal Investigation ("IRS-CI") since October 2008. Through my training and experience I have learned, among other things, financial investigative techniques used to carry out my responsibilities of conducting criminal investigations relating to violations of the Internal Revenue Code (Title 26, United States Code), the Money Laundering Control Act (Title 18, United States Code), the Bank Secrecy Act (Title 31, United States Code), and other related offenses. I have conducted numerous investigations involving violations of these federal laws. I have been the affiant on numerous search warrants and have participated in the execution of numerous other search warrants.

## PROPERTY TO BE SEARCHED

2. This affidavit is submitted in support of the application for a search warrant regarding certain email accounts stored at Cabinet A7, U.S. TelePacific Corp dba TPx Communications Datacenter at 2001 East Dyer Road, Santa Ana, California 92705.

1

3.    Based on the facts disclosed in this affidavit, there is probable cause to believe that located within the email accounts described in Attachment A are the fruits, evidence, and instrumentalities of criminal offenses in violation of Title 26, United States Code, Sections 7201 (tax evasion) and 7202 (willful failure to pay tax), and Title 18, United States Code, Sections 371 (conspiracy), 664 (theft or embezzlement from employee benefit plan subject to Title I of ERISA), and 669 (theft or embezzlement from a health benefit program).    The items to be seized are described more particularly in Attachment B.

## OVERVIEW

4.    The information detailed in this affidavit is based on my personal knowledge and observations, Internal Revenue Service (IRS) records, public records, third party witnesses including financial institutions, and my own investigation efforts.    I believe these sources of information to be credible and reliable based on the corroboration of the information and my experience with these matters.    The information in this affidavit does not include all of my knowledge and investigation into this case.    These facts are presented for the sole purpose of establishing probable cause in support of the application for a search warrant.

2

5.    Based on my training, experience, and feedback from other experienced law enforcement officers, I am aware that:

a. It is necessary for profit producing businesses to maintain adequate books and records of account to derive gross receipts and business expenses used to determine taxable income.  These records typically include ledgers, journals, receipts, invoices, bank statements, income tax returns, and payroll records.

b. Businesses typically maintain purchase and sales records, accounts receivable and payable, payroll, customer contact information, and other books, records, and notes used to document business income and expenses.  Also, businesses typically maintain emails, meeting minutes, meeting notes, and other internal communications.  These records are typically maintained for long periods of time by businesses, owners, and bookkeepers in secure, easily accessible locations such as their business offices and offsite storage facilities.

c. Individuals and businesses store financial and business records in electronic format using tools such as computers, servers, hard drives, compact disks, flash drives, and the internet.  They may

3

also store backups of these records in offsite locations in the event of a disaster or other failure. These electronic devices are typically maintained by business owners and bookkeepers in secure locations within their businesses, offices, and offsite storage facilities, for extended periods of time.

**FEDERAL LAWS**

6. Title 26 of the United States Code requires an employer to collect payroll taxes, which include federal income taxes, Social Security taxes, and Medicare taxes, from the wages paid to its employees and pay over these taxes to the United States through the IRS. This is referred to as the "trust fund" portion of payroll taxes. Employers are also required to pay additional payroll taxes to the IRS in an amount equal to the Social Security and Medicare taxes withheld from employees' wages.

7. Title 26 of the United States Code requires an employer to file quarterly Forms 941, Employer's Quarterly Federal Tax Returns, with the IRS reporting the total wages paid to its employees during the quarter and the corresponding payroll taxes due and owing to the United States. These quarterly tax returns must be filed by the last day of the month following the end of the quarter in question.

8.  Title 29 of the United States Code requires employers (also called Plan Sponsors) who operate 401(k) employee benefit plans and withhold employee contributions from their paychecks to remit those withholdings to the 401(k) plan trust in a timely manner.

9.  Title 29 of the United States Code requires employers (also called Plan Sponsors) who operate health care programs and charge employees premiums to apply those premiums to the health care program.

**BACKGROUND OF INVESTIGATION**

10. In February 2019, the IRS-CI in Milwaukee, WI, started receiving information from former employees of BP Peterman Law Group, LLC, a foreclosure law firm located in Brookfield, WI, regarding the illegal activities of Matthew Browndorf (Hereinafter Browndorf). The US Department of Labor Employee Benefits Security Administration (DOL-EBSA) and IRS-CI subsequently initiated an investigation in the Eastern District of Wisconsin relating to the following allegations.

    a. Browndorf willfully failed to truthfully account for and pay federal employment taxes to the IRS for Plutos Sama, LLC, Plutos Sama Employment Services, LLC, OC Legal Services, LLC, BP

Peterman Law Group, LLC, and BP Fisher Law Group, LLC.

b. Browndorf stole, embezzled, or unlawfully and willfully abstracted or converted to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets from the employee benefit plan called the Plutos Sama 401(k) Plan at The Vanguard Group, Inc.

c. Browndorf knowingly and willfully stole, embezzled, or otherwise without authority converted to the use of any person other than the rightful owner, or intentionally misapplied any of the moneys, funds, securities, premiums, credits, property, or other assets of the 2018 health care benefit program called the Plutos Sama Employee Services, LLC plan at Leading Edge Administrators.

**FACTS SUPPORTING PROBABLE CAUSE TO SEARCH**

11. California Secretary of State records show that Plutos Sama, LLC (Hereinafter Plutos Sama) was a holding company formed in 2013 in Delaware and registered with the State of California in 2014. Plutos Sama's headquarters were

located at 1900 Main Street, Suite 640, Irvine, CA.  Browndorf
was the Chief Executive Officer of Plutos Sama.

12. The Amended and Restated Limited Liability Company
Agreement of Plutos Sama, LLC, which agents received from
Michael Keadjian pursuant to a subpoena, shows that as of
10/31/2013, Browndorf was the managing member and majority
owner of Plutos Sama through the Matthew Browndorf Living
Trust, of which he is the trustee.

13. Records obtained and reviewed from the Central
District of California Bankruptcy Case 8:19-bk-10526-TA show
that on 01/16/2019, Plutos Sama changed its name with the
State of Delaware to LF Runoff 2, LLC, and on 02/14/2019 filed
Chapter 11 bankruptcy in the Central District of California.
The bankruptcy case is ongoing.

14. The Plutos Sama Organizational Chart, dated
11/8/2018, which was obtained and reviewed through the
Central District of California Bankruptcy Case 8:19-bk-10526-
TA, and other California Secretary of State filings show that
Plutos Sama was a holding company for numerous other
subsidiaries throughout the United States, including multiple
law firms.  Some of these subsidiaries were BP Fisher Law
Group, LLP (Hereinafter BP Fisher), BP Peterman Law Group,
LLC (Hereinafter BP Peterman), Wilson Keadjian Browndorf, LLP
(Hereinafter WKB), and OC Legal Services, LLC (Hereinafter

7

OCLS) (aka Plutos Sama Client Services, LLC (Hereinafter PSCS)).

15. A purchase agreement agents received from Michael Keadjian, pursuant to a subpoena, shows that Plutos Sama purchased The Fisher Law Group, PLLC from Jeffrey Fisher in 2015. Public records show the Fisher Law Group was a foreclosure law firm operated in Maryland and Washington D.C., with its headquarters in Maryland. Maryland Secretary of State records show that when Plutos Sama purchased The Fisher Law Group, it was renamed to BP Fisher and continued operating as a foreclosure law firm. Central District of California court records show that on 01/15/2019, BP Fisher filed Chapter 11 bankruptcy in the Central District of California. The bankruptcy case is ongoing.

16. A purchase agreement agents received from Michael Keadjian, pursuant to a subpoena, shows that Plutos Sama purchased J Peterman Legal Group Ltd. from James Peterman in 2016. Public records show that J Peterman Legal Group was a foreclosure law firm operated in Wisconsin, Illinois, and Indiana, with its headquarters in Brookfield, WI. Wisconsin Department of Financial Institutions records show that when Plutos Sama purchased the business, it was renamed BP Peterman and continued operating as a foreclosure law firm in Wisconsin, Illinois, and Indiana. Based on interviews with

multiple BP Peterman employees, in early 2019, Plutos Sama conducted a wind down of the BP Peterman operations and the business was fully shutdown by May 2019.

17. New York Division of Corporations records and information obtained from Michael Keadjian during an interview on 01/08/2020, shows that WKB was a law firm Browndorf formed with Michael Keadjian and registered in New York in 2015. WKB was focused on litigation, not foreclosure work and was referred to as their "white shoe law firm." WKB was primarily operated from the Plutos Sama headquarters in Irvine, CA. This business stopped operating in 2019 after Keadjian quit working with Browndorf.

18. California Secretary of State records show that OCLS was formed in Delaware in 2017 and registered with the State of California in 2017. Later in 2017 the business name was changed to PSCS. This business was formed as a legal support services entity.

19. California Secretary of State records show that Plutos Sama Holdings, Inc. (Hereinafter PSH) is a holding company formed in Delaware in 2018 and registered with the State of California in 2018 with its office at 1900 Main Street, Suite 640, Irvine, CA. PSH has since moved offices to 1840 Von Karman Avenue, Suite 1000B, Irvine, CA. PSH is

still an active business.  Browndorf is the Chief Executive Officer of the company.

20. The Plutos Sama Organizational Chart, dated 11/8/2018, which was obtained and reviewed through the Central District of California Bankruptcy Case 8:19-bk-10526-TA, shows PSH has numerous wholly owned subsidiaries including Plutos Sama Employment Services, LLC (Hereinafter PSES).  California Secretary of State records show that PSES was formed in Delaware in 2018 and registered with the State of California in 2018.  PSES was not an operating entity.  PSES was setup as an employment services business.

**Paycor, Inc.**

21. Case agents subpoenaed Paycor, Inc. and received payroll records of the Plutos Sama related entities.  Based on the records, from approximately February 2017 until February 2019, Plutos Sama, BP Peterman, BP Fisher, WKB, PSES, and OCLS (referred to as the Plutos Sama related entities) used the services of Paycor, Inc. to process their semi-monthly payroll.

22. In their subpoena response, Paycor also provided an explanation of the tasks and responsibilities of the clients and Paycor.  Paycor provided the following information:

   a. After the payroll data was entered by the Plutos Sama related entities, Paycor was responsible

10

for generating paychecks and mailing them to the Plutos Sama related entities. Paycor generated various payroll reports and mailed them with the paychecks. In addition, Paycor made the payroll reports available through their web application. One of the payroll reports that was mailed was a Taxes Due Report, which provided a breakdown of the taxes due to each taxing authority along with the amount due, due date, and remittance instructions.

b. Paycor generated Forms 941 (Employer's Quarterly Federal Tax Returns) for the Plutos Sama related entities from the first quarter of 2017 through the fourth quarter of 2018 based on payroll data entered by the entities. Paycor did not generate Forms 941 for the first quarter of 2019. Paycor mailed these forms to the entities on a quarterly basis. Paycor was not responsible for filing the Forms 941 with the IRS or making the payroll tax payments to the IRS on behalf of the Plutos Sama related entities.

**Comparison of IRS Records to Paycor Records**

23. IRS records for the first quarter of 2017 through the fourth quarter of 2018 show that none of the Forms 941

11

generated by Paycor for the Plutos Sama, BP Peterman, BP Fisher, WKB, PSES, or OCLS were ever filed.  Thus, none of the wages paid through Paycor or the corresponding payroll taxes were ever reported to the IRS.

24.  IRS records show that since February 2017 no federal payroll taxes owed by Plutos Sama, BP Peterman, BP Fisher, WKB, PSES, or OCLS for the four quarters of 2017 and 2018 were ever paid to the IRS.  Thus, the payroll taxes documented on Forms 941 generated by Paycor are still due and owing.

[Remainder of page purposefully left blank]

25. The affiant prepared the following chart summarizing the unpaid federal payroll taxes documented on Forms 941 for the four quarters of 2017 and 2018, as calculated by Paycor and provided pursuant to a subpoena:

| FEDERAL PAYROLL TAXES DUE – PER PAYCOR FORMS 941 | | | |
|---|---|---|---|
| **ENTITY NAME** | **2017** | **2018** | **TOTAL** |
| Plutos Sama LLC | $ 1,581,815.36 | $          – | $ 1,581,815.36 |
| Plutos Sama Employment Services | $          – | $ 1,269,374.89 | $ 1,269,374.89 |
| BP Peterman Law Group LLC | $    484,851.67 | $    183,712.27 | $    668,563.94 |
| BP Fisher Law Group LLP | $    416,636.02 | $    182,128.76 | $    598,764.78 |
| OC Legal Services LLC | $     88,731.57 | $          – | $     88,731.57 |
| Wilson Keadjian Browndorf LLP | $          – | $    544,957.27 | $    544,957.27 |
| **TOTAL** | **$ 2,572,034.62** | **$ 2,180,173.19** | **$ 4,752,207.81** |
| Footnote: These federal payroll taxes include federal income tax withholdings, Social Security tax withholdings, Medicare tax withholdings, and the employer's share of Social Security and Medicare taxes. | | | |

**Plutos Sama 401(k) Plan**

26. Case agents subpoenaed and received 401(k) and other retirement plan records from The Vanguard Group Inc., The Lincoln National Life Insurance Company, ADP LLC, and American Trust Retirement, for the Plutos Sama related entities. Based on these records, on 07/30/2018, the Plutos

Sama 401(k) Plan was established through Vanguard Group, Inc.
This plan was a consolidation of multiple previous 401(k)
plans established by Plutos Sama's subsidiaries.   The
previous 401(k) plans included the BP Law Group LLP Retirement
Savings Plan and Wilson Harvey Browndorf, LLP 401(k) Plan at
Lincoln Financial Group, the BP Peterman Law Group, LLC 401(k)
Plan at American Trust & Savings Bank, and the BP Fisher Law
Group, LLP 401(k) Plan at ADP.

27. Based on subpoenaed records from Paycor and Vanguard,
in 2018, multiple employees had 401(k) contributions deducted
from their wages, which were never remitted to the Plutos
Sama 401(k) Plan at Vanguard.  Based on an analysis of these
records conducted by DOL-EBSA, $62,174.38 of contributions
were deducted from employee wages and were never remitted to
the Plutos Sama 401(k) Plan at Vanguard.   This analysis
concluded that 11/02/2018 was the final date of any
contributions to this plan.  However, multiple employees
continued to have 401(k) contributions deducted from their
wages in the months following.  For example, employee with
initials M.O. was paid by PSES in 2018.  For each of the 11
pay periods between 07/20/2018 and 12/20/2018, $450 was
deducted from M.O.'s wages and was to be remitted to M.O.'s
Plutos Sama 401(k) Plan account at Vanguard for a total of

14

$4,950. However, only $1,800 of M.O.'s contributions from
that time period were ever remitted to M.O.'s account.

**Plutos Sama, LLC Health Benefit Plan**

28. Case agents subpoenaed and received health care
benefit plan records from Leading Edge Administrators for the
Plutos Sama related entities. Based on these records, the
Plutos Sama related entities established a self-insured
health care benefit plan through Leading Edge Administrators
for 2018. Under this plan, Plutos Sama Employee Services,
LLC contracted with Leading Edge Administrators to be the
claims administrator for the plan and used the Cigna health
network. Under these contracts, the Plutos Sama related
entities were responsible for paying the health claims of the
plan and withholding health insurance premiums from employee
wages to remit to the plan.

29. Based on subpoenaed records from Paycor and Leading
Edge Administrators, in 2018, multiple employees had health
insurance premiums deducted from their wages, which were
never remitted to the Plutos Sama health care benefit plan.
Furthermore, in December 2018, Leading Edge Administrators
retroactively terminated the plan to August 31, 2018, because
of delinquent payments. This caused numerous employee claims
to go unpaid by the plan, despite the fact that those
employees had health insurance premiums withheld from their

15

wages and were covered at the time of their medical procedures. Based on an analysis of these records conducted by DOL-EBSA, a total of approximately $332,250.41 in health claims submitted on behalf of Plutos Sama employees went unpaid. This includes claims worth tens of thousands of dollars for employees who had complex medical procedures, surgeries, and labor and delivery charges.

30. Based on subpoenaed records from Leading Edge Administrators, the final payments to the 2018 Plutos Sama health benefit plan were made on 11/28/2018. However, according to Paycor records, employees continued to have health insurance premiums deducted from their wages in December 2018. For example, employee with initials H.F. was paid by BP Peterman in 2018. Each pay period through 12/31/2018, a health insurance premium of $91.55 was deducted from H.F.'s wages. In the fall of 2018, H.F. had surgery, which was pre-approved by insurance. However, when Leading Edge Administrators retroactively terminated the Plutos Sama health insurance plan, H.F.'s medical bills went unpaid. H.F. has $88,382.91 of unpaid medical bills as a result.

**Information from Employees**

31. On 01/10/2020 and 01/23/2020, Plutos Sama employee Brittney Rowland was interviewed by case agents. Rowland worked at the Plutos Sama office at 1900 Main Street in

16

Irvine, CA. Rowland was employed in a number of different positions by Plutos Sama from 2015 to 2019. More particularly, Rowland was the Assistant Controller in 2017 and Controller in 2018 and 2019. Rowland provided the following information during the interview, which does not include everything she provided:

    a. In April 2017, Rowland became the assistant controller for Plutos Sama at Browndorf's request to help the Controller, Michele Stover, as she dealt with personal issues. Rowland did not have experience as a controller, so she asked Stover and Browndorf what to do and they gave her directions.

    b. When Rowland became the assistant controller, she was not a signor on the bank accounts. She frequently made trips to Stover's residence to have her sign checks. Rowland received emails from different departments identifying bills that needed to be paid. She told the accounting department to write checks to pay bills based on directions from Stover or Browndorf. Then Rowland took the checks to Stover to sign and Rowland mailed them out.

17

c. Eventually Browndorf replaced Stover with Rowland as the full time controller around the beginning of 2018.

d. As controller, Rowland woke up early every morning around 5:00 am or 6:00 am to check the bank account balances and to reconcile the outstanding checks for every open account for Plutos Sama and its subsidiaries. On a daily basis, Rowland updated the balances and outstanding checks in a spreadsheet she maintained. After updating the spreadsheet Rowland emailed the total available balance for each bank to Browndorf with a "hot list" of the top priority bills that needed to be paid. Then, Browndorf determined what bills to pay that day and instructed Rowland to pay them. The "hot list" was Browndorf's idea to prioritize expenses and to keep in the know about everything that was happening. The "hot list" listed the vendor, amount due, and payment deadline. They created the "hot list" about 6 months before Rowland quit, which happened in February 2019.

e. People who were owed money regularly called Rowland and demanded payments. Rowland took

those demands to Browndorf and he told Rowland what to do and say. Browndorf often instructed Rowland to lull the vendors.

f. Rowland started processing the payroll for Plutos Sama and its subsidiaries when she became the billing coordinator in 2016 and did it until she left in February 2019.

g. Plutos Sama and its subsidiaries used a third party payroll processor, which changed multiple times. From about January 2017 to February 2019 they used Paycor for payroll services.

h. Every employee in California was salaried, but there were a lot of hourly employees in Wisconsin and Maryland. Rowland received an email from a local representative in Wisconsin and Maryland every pay period with a spreadsheet of the hours worked by hourly employees. Rowland received the spreadsheet from Sara Stangel for the Wisconsin employees, and she could not recall who sent the email from Maryland. Once Rowland received the payroll data, she input it into the payroll system.

i. Paycor has a self-service web based portal that Rowland and a few other Plutos Sama employees

19

had access to.  Rowland was the primary employee who accessed Paycor's online portal to download reports and input the semi-monthly payroll data so paychecks could be generated.  Sara Stangel was the head of human resources and had access to the Paycor portal.  Stover and Oudin also had access at one point.

j. Payroll was processed semi-monthly.  Once Rowland input the payroll data, the third party payroll processor printed the paychecks and mailed them out to the various offices around the United States.  The paychecks for the California employees were mailed to Rowland.  She received a stack of envelopes containing the paychecks and paystubs, and she handed them out to employees.  Sometimes the paychecks for employees in other states were mailed to California by mistake.  Rowland forwarded those to the appropriate office.

k. Everyone's paycheck bounced regularly.  They would have to wait for Browndorf to resolve the issue before depositing their paychecks.

l. Rowland kept a spreadsheet of the outstanding payroll for Plutos Sama and its subsidiaries.

Oudin would have entered the back pay into the NetSuite accounting software. Pat Farenga, Mike Keadjian, Gene O'Brien, and Vic Boyd did not receive all of their back pay.

m. The payroll ledgers were available online and were mailed to the Irvine office once a quarter by the payroll processors. Rowland thinks Oudin checked the payroll ledgers and entered the payroll data into NetSuite. Someone downloaded the payroll ledgers and put them on the server.

n. Oudin maintained a spreadsheet of the unpaid payroll taxes for the Plutos Sama entities at Browndorf's direction. This spreadsheet was kept separate from the accounting system. Browndorf and Farenga knew about and monitored this spreadsheet. In approximately the summer of 2018, Oudin told Rowland he needed the employment tax withholding amounts from the payroll summaries to create the payroll tax liability spreadsheet. At Oudin's request, Rowland downloaded all of the current and historic payroll summaries from the Paycor portal and saved them to the accounting drive on the server for Oudin to access. Then, for each

of the next 4 to 6 pay periods, Rowland downloaded the payroll summaries to the accounting drive for Oudin to access. Eventually Rowland got Oudin access to the Paycor payroll portal, so he started downloading the payroll summaries himself.

o. Sometime in the summer of 2018 when Browndorf was trying to get more funding, he asked Rowland to get him the payroll tax spreadsheet. Rowland got it from Oudin and emailed it to Browndorf. Rowland looked at the spreadsheet and it showed over $5 million in payroll tax liabilities.

p. After Rowland emailed the spreadsheet of unpaid payroll taxes to him, Browndorf called her and reprimanded her. He screamed at her on the phone and said, "What on Earth are you thinking?" and "Now I don't have plausible deniability." Browndorf directed Rowland to never send payroll tax information in an email again. Rowland may have told Farenga about this incident.

q. Since April 2017 when she became the assistant controller, Rowland has known about the unpaid payroll tax liability for Plutos Sama and its subsidiaries. Browndorf, Farenga, Rowland,

Stover, and Oudin all know about the payroll tax liability. Farenga constantly raised concerns about the payroll tax liability to Browndorf when Rowland was present. Browndorf said they would take care of the taxes when they got funding.

r. Once a quarter, Paycor mailed hardcopies of the payroll summaries and tax returns to Rowland in the Irvine office. When asked if the tax returns were Forms 941, Employer's Quarterly Federal Tax Returns, Rowland said she does not know anything about taxes or the different tax form numbers. After being shown a copy of the Plutos Sama LLC Form 941 prepared by Paycor for the first quarter of 2017, Rowland verified that Paycor mailed her Forms 941 for all of the entities once a quarter.

s. When Rowland received the payroll tax returns in the mail from Paycor, she opened the envelopes and gave the returns to Farenga in his office. Farenga stacked the tax returns on his round desk in his office and waited for Browndorf to instruct him to file them, but Browndorf never did. Rowland does not believe anything was ever done with the stack of returns in Farenga's office.

t.  Browndorf knew about the stack of tax returns in Farenga's office because he saw them.  Every day Farenga told Browndorf they needed to take care of the taxes.  Browndorf would tell Farenga that they'd take care of the taxes when they got funding.

u.  There was one time when Rowland and Farenga completed some tax related documents and tried to mail them, but Browndorf found the envelope in the outgoing mail tray and pulled it. Browndorf brought the envelope back to Rowland and Farenga and said they could not send that in yet because they didn't have the money to pay. Rowland did not recall what the documents were, but she knew it related to taxes and it took her and Farenga a long time to complete.

v.  On another occasion, Browndorf told Rowland he needed some Forms 941 completed by that same evening and taken to his tax accountant, Daniel Layton.  Browndorf instructed Rowland to prepare the Forms 941 for each entity and each quarter for one year.  Rowland did not recall what tax year the Forms 941 were for.  Farenga sat down with Rowland at her desk and helped her complete

the Forms 941.  Then Rowland took them to Daniel Layton's office.

w. The payroll tax liability was not on Browndorf's "hot list."  Browndorf directed Rowland to never email him anything about the payroll tax liability.

x. Browndorf liked to control every penny and no one could pay the payroll taxes without Browndorf's pre-approval.  Browndorf would have probably fired Rowland if she paid the payroll taxes without getting his pre-approval.

y. Browndorf was responsible for approving the filing of any and all tax returns for his businesses.  Browndorf absolutely knew the employment tax returns were not being filed.

z. When told by agents that failing to file employment tax returns and failing to pay employment taxes can be considered a crime, Rowland said that is why she and Farenga pushed Browndorf so hard.  She said, "Farenga and I were constantly telling him (Browndorf) this should be taken care of."  Browndorf knew exactly how much payroll tax was owed and chose not to do anything about it.

aa.  In 2017 Plutos Sama had a fully insured health benefits plan through Aetna.  Health insurance premiums were withheld from the paychecks of employees who participated in the plan.  Aetna would give Plutos Sama 3 months to pay before they terminated the plan and Browndorf waited until the last minute to pay.  At the end of each 3 month period Browndorf told Rowland they had to pay the insurance because the employees could not know they were behind on payments.

bb.  In 2018 Browndorf switched Plutos Sama employees to a self-funded health benefit plan through his friend who is an insurance broker in New York.  The insurance broker was Leading Edge Administrators (LEA) and Rowland thinks the medical network was through Cigna.  The way Rowland understood it, LEA had an account setup for Plutos Sama used to pay claims, but the account was not being funded by Plutos Sama.  Health insurance premiums were withheld from the paychecks of employees who participated in the plan and Plutos Sama was supposed to contribute the rest of the money.  Rowland believed the employer/employee split was 50/50 or 60/40.  This

26

plan was retroactively terminated to September 2018 due to non-payment. Rowland had medical, dental, and vision insurance through the Plutos Sama health benefits plans.

cc. The accounting staff was responsible for making the health insurance payments once Browndorf directed them to allocate funds to make the payments. If the payment was a wire transfer, Rowland asked one of the accountants to setup the wire transfer and she approved it. If the payment was a check, Rowland asked an accountant to print the check, she'd sign it, and instruct the accountant to mail it. When the health insurance was not paid and the plans were terminated, it was because Browndorf decided not to allocate funds to pay it. Browndorf knew there were health insurance premiums withheld from employee paychecks that were not remitted to the healthcare provider.

dd. In December 2018 Rowland had some significant healthcare expenses. Rowland was worried about the status of her health insurance benefits. She knew the benefits might be terminated due to delinquent payments not paid by Plutos Sama.

27

Rowland told Browndorf they needed to pay the health insurance because she was going to have significant medical bills and he said he would take care of it. Browndorf did not pay the health insurance and now Rowland owes over $20,000 in medical bills. Rowland's medical bills are in collection status and as a result her credit score is in the 400s. Rowland cannot even rent an apartment.

ee. Browndorf frequently instructed Rowland to transfer money from the business accounts to his personal accounts at Wells Fargo Bank. Browndorf either called Rowland, texted her, or talked to her at the office and said, to paraphrase, I need money in Wells now. That meant Browndorf wanted Rowland to transfer money from a business account to his personal account at Wells Fargo Bank. Browndorf typically told Rowland what business account to transfer the money from. Rowland did not have access to the Wells Fargo accounts, so she received wire transfer instructions from Browndorf's personal assistant Raeanne Murphy.

ff. Browndorf, Farenga, and Rowland were added to BP Peterman Spring Bank accounts because

28

Browndorf wanted full control of the accounts. Browndorf did not want to have to ask other people to write checks or transfer money.

gg. Rowland verified her signature on checks 184526, 184528, and 184529 all written from BP Peterman Spring Bank account 10000511 to Matthew Browndorf. Browndorf directed Rowland to write these checks to him. Rowland did not know what these funds were used for, but these checks would have been deposited into Browndorf's personal account at Wells Fargo Bank. Rowland said any check written to Browndorf for a round dollar amount and a blank memo line was deposited to Browndorf's personal account.

hh. When Browndorf needed money, he asked Rowland what business accounts had money on that particular day. Once Rowland told him which account had money, Browndorf told Rowland to write him a check from that account for a specific amount. Then he told Rowland to give it to Raeanne Murphy to deposit into his personal account at Wells Fargo Bank. Murphy was Browndorf's personal controller who handled all of Browndorf's personal finances.

ii.  Rowland verified her signature on check 184527 written from BP Peterman Spring Bank account 10000511 to BP Fisher Law Group LLP in the amount of $163,000, dated 11/26/2018.  Rowland knew this check was going to bounce when she wrote it and she told Browndorf it was going to bounce, but Browndorf told her to write it anyway.  Browndorf said there would be money coming tomorrow to cover the check, but the money never came. Browndorf tried to deposit this check into BP Fisher Pacific Enterprise Bank account 2000035788 on 11/26/2018 and it bounced.

jj.  When asked why a majority of the operating funds from BP Peterman Spring Bank accounts 10000511 and 10000160 were transferred to BP Fisher and Plutos Sama accounts, Rowland said they were frequently moving funds from accounts that had funds to accounts that did not have funds or that had negative balances.  All of these transfers were done at Browndorf's direction.

kk.  Browndorf directed Rowland to pay the mortgages for his personal residence through the business accounts.  One of the mortgage lenders

30

is Verde Investments.   Rowland said most of the time she paid Browndorf's mortgages through the business accounts.

ll.   Browndorf directed Rowland to make payments on his lake house in Chazy, NY, sometimes.   Those payments went to Steve Herrin (phonetic).   Rowland did not know the details, but Browndorf got Herrin to invest in the Chazy lake house.

mm.   Browndorf's father is named Melvin and his mother is named Elsbeth.   His father goes by Mel and his mother goes by Bonnie.   Browndorf directed Rowland to pay his parents' condominium rent to a person in South Orange County.   Rowland recalled paying six months of rent up front.   She also paid Mel's real estate agent expenses including advertising expenses.

nn.   Browndorf's, his wife, Sarina's, and Browndorf's parents' car payments were setup on autopay through the business accounts.   These payments were setup before Rowland got access to the accounts.   One of the payments was $2,600 and one time it bounced.   Browndorf directed Rowland to make sure to pay that bill.

31

oo.  Browndorf's housekeeper and nanny for his
children, Emely Dorantes, was paid by the
business and was on the payroll.  Dorantes worked
strictly for Browndorf at his residence.[1]

pp.  Sarina was on the payroll, but she did not do
any work for the business.  Sarina went to the
Irvine office sometimes to work on her own
cannabis business.  Sarina also did a short
motivational program for people in the office
similar to what Tony Robbins does.  The program
lasted a few months.

qq.  Browndorf was an authorized user on personal
AMEX credit cards he had under Sarina's name.
Business accounts were linked to these personal
AMEX cards so bill payments could be made from
the business accounts.  Typically, Jeff Kenny or
Raeanne Murphy made the bill payments, but
sometimes Browndorf instructed Rowland to make
bill payments on his personal AMEX cards from
the business accounts.

---

[1] Dorantes was interviewed by case agents and corroborated
the statement Rowland made about her role as nanny and
housekeeper for Browndorf.  Also, payroll records show she
was paid wages by Plutos Sama.

rr.  Browndorf asked Rowland to do things she was not comfortable doing.  Browndorf asked Rowland to write a lot of checks with funds they did not have and to lie to people on a regular basis. Browndorf told Rowland to lie to vendors by telling them she sent wire transfers when no wire transfers were sent.  A couple of times per week Browndorf told Rowland to create wire transfer confirmations and send them to vendors and investors, but the money was never sent.  When the vendors and investors emailed Rowland asking where the money was, Browndorf made up elaborate lies and made Rowland tell them the lies. Rowland said Browndorf lied all day long.

ss.  Rowland's official title was controller, but she did not perform the duties of a controller. Everything Rowland did involving cash management was done at Browndorf's direction.

32. On 01/14/2020, Plutos Sama employee Michele Stover was interviewed by case agents.  Stover worked at the Plutos Sama office at 1900 Main Street in Irvine, CA.  Stover was employed in the accounting department from 2013 to 2019.  More particularly, Stover was the Controller from 2015 to 2019.

Rowland provided the following information during the
interview, which does not include everything she provided:

   a. Stover worked alongside Rowland and taught her
      the job of a Controller.  As part of their
      controller duties, Stover and Rowland reviewed
      the accounts payable with Browndorf on a regular
      basis.  Browndorf determined what bills to pay
      and when and instructed Stover and Rowland to
      make the payments.  All bill payments were pre-
      approved by Browndorf.

   b. BP Peterman in Wisconsin, BP Fisher in Maryland,
      and WKB were the primary operating businesses in
      the Plutos Sama organization.  Stover estimated
      that 70% of the revenue generated by the Plutos
      Sama organization was generated by BP Peterman
      and BP Fisher.

   c. Revenue was deposited to BP Peterman, BP Fisher,
      and WKB bank accounts and then Stover made daily
      transfers at Browndorf's direction.  The funds
      were typically transferred to Plutos Sama bank
      accounts in California and then disbursed at
      Browndorf's discretion.  Stover said money moved
      around "like crazy."

d. Despite most of the revenue being generated in Wisconsin and Maryland, a lot of money was allocated to pay bills in California and elsewhere.   There were large salaries to employees who were not generating any revenue including: Browndorf, his wife Sarina, Chief Operating Officer Gene O'Brien, the information technology department, the accounting department, and various attorneys.   Browndorf made all of the salary decisions and he decided who got paid and when.

e. Plutos Sama and its subsidiaries used the services of third party payroll companies to process the payroll.   The third party payroll company changed regularly and included the following: Oasis, QuickBooks, Paychex, ADP, and Paycor.   There were also periods of time when Stover processed the payroll in-house and manually wrote payroll checks.

f. The payroll was processed twice a month on the 5th and 20th.   Each pay period the payroll data for both salaried and hourly employees was entered into an online system setup by the payroll company.   Then the payroll company

generated paychecks and mailed them to the separate offices around the United States. Stover received the paychecks for the employees in the Irvine, CA office and disbursed them. The paychecks came with a payroll ledger summarizing the paychecks and employment tax liabilities for the pay period. Farenga used the payroll ledgers to create journal entries for the employment tax liabilities.

g. Browndorf directed Stover and the third party payroll companies to "net pay" employees. Browndorf setup the payroll services and opted to self-pay the employment taxes. Initially, Browndorf setup the service properly so the payroll company would pay the employment taxes and generate the paychecks, but Browndorf did not allocate enough funds to make the full payroll and the tax payment services were turned off. Similarly, the health insurance and other benefits were setup as self-pay.

h. When Stover processed the payroll in-house, she only wrote net paychecks. She did not write checks to the various taxing authorities, 401k plans, or health insurance providers for the

36

amounts withheld from paychecks when she processed the payroll. As the controller Stover was responsible for signing all of the checks, but she does not recall signing any checks written to the various taxing authorities when she was the controller.

i. Browndorf was responsible for deciding when to pay the employment taxes. The employment taxes were not consistently paid.

j. Stover has known about the Plutos Sama employment tax issues since approximately 2015 or 2016. She did not confront Browndorf about the accrued employment tax liability because he already knew about it. Browndorf received reports detailing the amounts owed for employment taxes.

k. Browndorf knew everything that was owed. Weekly and sometimes multiple times per week, Stover, Farenga, Rowland and Browndorf created accounts payable lists and combined them into one list. Then, Browndorf reviewed the list and highlighted the urgent bills to pay. The employment tax liabilities should have been on the accounts payable lists, but Stover does not specifically recall if it was.

37

l. Plutos Sama offered health insurance coverage to employees. Health insurance premiums were withheld from the wages of employees who participated in the health plans.

m. In 2017, Plutos Sama had a fully insured health plan. The health insurance payments were always late, but they were eventually paid. Browndorf always waited until the last minute before the coverage was cancelled to pay the health insurance.

n. In 2018, Plutos Sama switched to a self-funded health insurance plan and the payments were rarely made.

o. Stover and Rowland made the health insurance payments at Browndorf's direction. The health insurance obligations were on Browndorf's accounts payable list and he knew the health insurance was not being paid.

p. Employees had issues with their health insurance coverage lapsing. Employees complained to Stover when their health insurance premiums were not remitted to the health insurance providers and their insurance was rejected. Stover also

has medical bills that were not covered because
the insurance lapsed.

q. Plutos Sama offered 401k plans to employees.
Participation in the plans was low because
Browndorf stopped the employer matching benefit
in 2015 or 2016.

r. There were three 401k plans Stover consolidated
into one Plutos Sama plan at Vanguard.  The three
original plans were the BP Fisher Law Group plan
at ADP, the BP Law Group / WKB plan at Lincoln
Financial, and the BP Peterman Law Group plan at
an unknown institution.

s. Stover setup the Vanguard 401k plan and she is
currently the administrator.  She started the
consolidation in 2017 and finished in 2018.
Stover transferred all funds from the three
original plans into the Vanguard plan.

t. Stover and Rowland remitted employee deferrals
to the 401k plans at Browndorf's direction.
Stover estimated there was approximately $5,000
of employee deferrals not remitted to the 401k
plans.  Browndorf was aware of this.

u. Browndorf's housekeeper and nanny were on the
Plutos Sama payroll.  Browndorf had a maintenance

39

employee named Kent Lang on the Plutos Sama payroll. Lang did maintenance work at Browndorf's house and at the office. He also was Browndorf's driver.

v. Browndorf's wife, Sarina, was on the Plutos Sama payroll. She did a short life coaching and morale building program at the office, but her work was not commensurate with her pay.

w. The chronic payroll issues started in October 2018 when employees stopped getting paid all together. Prior to that, there were issues with the paychecks bouncing, but the issues would get resolved.

x. Stover received frequent phone calls and emails from employees asking where their paychecks were. Employees told her they were missing their house, car, and medical payments because they were not receiving their paychecks. Stover said she was doing her best, but Browndorf would not let her be transparent with employees. Browndorf instructed Stover to tell employees lies about why their paychecks were late. He instructed Stover to tell them that the paychecks were on

the way or there was a wire transfer coming when he knew that was a lie.

y. Browndorf had multiple personal and corporate American Express (AMEX) credit cards. He also had corporate Visa credit cards with a $420,000 credit line, but Stover could not recall the name of the bank that issued the Visa cards. Browndorf used these credit cards to pay for expensive personal travel and other personal expenses in addition to the business expenses. Stover paid Browndorf's AMEX bills through the business accounts.

z. Browndorf had a personal assistant named Raeanne Murphy who was on the Plutos Sama payroll as his executive assistant. Murphy paid Browndorf's personal bills and arranged his personal travel. Murphy did not do any work for Plutos Sama. When Murphy needed money to pay Browndorf's personal bills, she went to Stover and asked her to transfer to the funds. After obtaining Browndorf's approval to transfer the funds, Stover transferred money from a business account to Browndorf's personal account.

aa.  Browndorf regularly directed Stover to wire transfer funds from business accounts to his personal accounts.  The funds were typically wire transferred to Browndorf's personal account at Wells Fargo Bank.  A lot of the business deposits were allocated to Browndorf's personal use even when the business bills and payroll were not being paid.

bb.  Paying Browndorf's AMEX bills and transferring money to his personal accounts took precedence over any other payments.

cc.  Stover told Browndorf that while he was taking money for himself, his employees were hurting. Browndorf did not say anything in response. Stover said, "It was always about Browndorf." Stover said Browndorf had no shame.

dd.  Browndorf's monthly car payments were made through the business accounts.  Browndorf had a Mercedes Benz SUV and a Maybach that were paid through the business accounts.  Stover wrote a $10,000 check from a business account to the Fletcher Jones Mercedes Benz dealership as a down payment for one of Browndorf's cars.  No other employees' cars were paid by the businesses;

42

however, Michael Keadjian received a car allowance on his paycheck.

ee. Browndorf's personal expenses that were paid through the business accounts were booked to his capital account in the accounting system by Stover and the accounting staff.

ff. Starting in mid-2017, Browndorf would tell Stover to cut checks from accounts he knew did not have the funds to cover the check and the checks would bounce. He would tell Stover to initiate wire transfers to people and send them wire confirmations when he knew the wires would not process just to get people off his back. This activity started happening a lot more frequently in October 2018.

33. On 01/09/2020, Plutos Sama employee Patrick Farenga was interviewed by case agents. Farenga worked at the Plutos Sama office at 1900 Main Street in Irvine, CA. Farenga was Chief Financial Officer (CFO) for Plutos Sama from 2015 to 2019. Farenga provided the following information during the interview, which does not include everything he provided:

a. Farenga's job description as the CFO of Plutos Sama LLC was primarily to assist with raising

capital and to help grow the business through acquisition.

b. Farenga reviewed the Plutos Sama Holdings Inc. and Plutos Sama LLC Organizational Chart dated 11/8/2018.[2] Farenga said the Plutos Sama LLC and Plutos Sama Holdings Inc. organizational chart was setup to raise capital and attract investments. Farenga explained law firms cannot raise capital through third party investments so they setup non-law firm entities to service the law firms and raise capital. Farenga was the CFO for all of the entities on the organizational chart. Browndorf was the majority owner of all these entities and was ultimately in charge of these businesses. BP Fisher Law Group LLP (BP Fisher), BP Peterman Law Group LLC (BP Peterman), Wilson Keadjian Browndorf LLP (WKB), and Civil Demand Associates Inc. (CDA) were operating subsidiaries of Plutos Sama LLC. Plutos Sama LLC was a non-operational holding company. Plutos Sama Employment Services LLC (PSES) was

---

[2] This organizational chart was obtained from the Office of the United States Trustee for the Central District of California.

used strictly for processing all non-attorney payroll for the Plutos Sama organization.

c. In regard to banking, the law firms each had an operating account and a trust account. Revenue was deposited to the operating accounts and then the funds were disbursed at Browndorf's discretion on a daily basis. Browndorf was responsible for the allocation of cash and capital for all the Plutos Sama entities.

d. Browndorf funneled money from the operating accounts of BP Peterman in Wisconsin and BP Fisher in Maryland to Plutos Sama accounts in California to fund his lifestyle. Browndorf also used other business accounts to fund his lifestyle. The funds Browndorf received were accounted for as draws.

e. Farenga knew Browndorf lived a lavish lifestyle, but he did not confront him about spending the company's money. Farenga thought nothing good would come from confronting Browndorf about the draws. Farenga said Browndorf knew the ramifications of the draws he was taking.

f. Browndorf has a nice house in Irvine, CA, with 3 recorded mortgages and 1 unrecorded mortgage. He

45

has expensive cars including a Ferrari or Lamborghini and a Mercedes Maybach. Browndorf's nanny is paid through the business. He takes expensive trips with his family. Browndorf spent $50,000 for first class plane tickets for himself, his wife, and kids to fly to Poland. Browndorf pays for everything for his parents and his kids, including luxury car and residential rent payments. Browndorf's and his family's lifestyle is high end and it is primarily funded through Plutos Sama.

g. Browndorf directed the cash management of Plutos Sama and its subsidiaries. When Browndorf needed money, he directed employees to make transfers from the business accounts to his personal accounts, and to pay his personal credit card bills and other personal bills on his behalf.

h. Browndorf had two executive assistants on the Plutos Sama payroll. One of them was his personal assistant. She was responsible for keeping track of Browndorf's and his wife, Sarina's, personal finances and personal schedules. The other executive assistant handled typical executive assistant duties. Her duties

46

included booking flights for business travel, answering phone calls and emails, and running errands for Browndorf.

i. When Browndorf needed funds to pay personal bills, either Browndorf or his personal executive assistant would go to the controller and tell the controller to transfer the funds or write the checks. Farenga was not involved in this process.

j. In the Plutos Sama operating agreement, Browndorf was guaranteed annual draws of $650,000. In actuality, Browndorf was taking draws of $1 million to $1.5 million annually. The draws are reported on Browndorf's Schedule K-1s from Plutos Sama LLC. Farenga did not recall if these draws included all of Browndorf's personal credit card bills paid by Plutos Sama.

k. Browndorf's draws were taken from whichever business and whichever account had the money at the time Browndorf needed the funds.

l. Browndorf knew his employees were not receiving their paychecks and payroll taxes were not being paid at the same time he was directing the controller to fund his personal draws.

47

m. The Plutos Sama accounting department was behind
on paying everything.  They were behind on paying
every vendor, rent, payroll, service providers,
and ads.

n. Making the semi-monthly payroll was always a
struggle because money was tight.  Employees
frequently either did not get their paychecks or
their paychecks bounced.  Browndorf determined
what employees got paid and when.  Farenga
estimated that in the end there was approximately
$800,000 in outstanding employee paychecks.
Browndorf would pay the "squeaky wheel" or based
it on which business he wanted to keep afloat.
Employees were vocal about not receiving their
paychecks and Browndorf knew about their issues.
Employees complained about not being able to pay
their rent, car, or other bills because of their
delinquent wages.  From time to time, Browndorf
gave the California employees a pep talk and told
them money was coming to pay them, but the money
never came.  Browndorf was a slick talker.

o. Plutos Sama employees received net pay on their
paychecks after taxes and other deductions were
withheld.  Plutos Sama was behind on paying the

48

withheld payroll taxes.   Farenga told Browndorf
multiple times that paying the Plutos Sama
payroll taxes was a priority and it needed to be
resolved.   Browndorf decided to not allocate
funds to pay the payroll taxes.   Paying the
payroll taxes was not on Browndorf's list of
priorities.   Browndorf's list of priorities
included paying his personal draws and expanding
into Poland and San Antonio.   Browndorf's goal
was to pay the payroll taxes when they got more
financing.

p. Browndorf had payroll tax issues in 2013 and 2014
relating to BP Law Group and WKB.   Browndorf did
an offer in compromise and made some payments on
the taxes.   Browndorf knew how to play the system
and extend the life of not filing tax returns.
Browndorf told Farenga if you can't pay the
employment taxes you don't file the Forms 941.

q. Farenga was not sure if the employment tax filing
service was turned on for the third party payroll
providers.   The controller was responsible for
preparing and filing the Forms 941 and Forms 940,
but Farenga did not know if the controller
actually prepared or filed them.   If the Forms

49

941 were not filed, it would have been Browndorf's decision to not file them. It was Browndorf's responsibility to decide when to file Forms 941.

r. Either the controller, receptionist, or someone else in the accounting department would hand out the payroll checks to employees. Farenga never handed out the payroll checks.

s. The paychecks came with a payroll ledger that listed the aggregate payroll data for the period. Farenga did not review these payroll ledgers.

t. When the paychecks were cut, sometimes the controller held onto them or they asked the employees to hold onto them until there were funds available to cash them. For some pay periods, some employees did not receive a paycheck at all.

u. In 2017 and 2018, Farenga received about 9 or 10 of the 24 paychecks he was owed each year. Farenga was not on Browndorf's list of employees who needed to be paid. Browndorf thought Farenga could absorb missing paychecks better than other employees. Farenga is still owed his back pay.

v. There were three 401k plans under the Plutos Sama

umbrella of companies.  There was a combined BP Law Group and WKB plan and Farenga was the administrator of that plan.  There was also a BP Fisher plan and a BP Peterman plan.  Farenga did not recall if he was the administrator on the BP Fisher and BP Peterman plans.  The goal was to consolidate the three 401k plans into one plan, but Farenga did not believe the consolidation occurred.  Farenga believed one of the 401k plans was through Lincoln Financial Group, but he could not remember which plan it was.

w. It was the controller's job to remit 401k deferrals to the plans, but the controller needed Browndorf's approval to make the payments. Browndorf determined when and how much was remitted to the 401k plans as the allocator of all cash and capital.  The 401k remittances were made via ACH payment or wire transfer.  Farenga did not know how often 401k remittances were made, but they were behind on making the payments like they were behind with every other vendor.

x. In 2018, Browndorf switched the company to a self-funded health insurance plan.  Browndorf's college friend was the broker who setup the plan.

The self-funded plan involved a third party administrator (TPA), but Farenga could not recall the name of the TPA. The TPA negotiated the rates and paid the medical bills. The medical provider billed the TPA, the TPA paid the medical bills, and Plutos Sama reimbursed the TPA. Insurance premiums were withheld from the paychecks of those employees who participated in the plan and they got a health insurance card. Farenga believes that when he resigned, Plutos Sama was behind on payments to the TPA. If the TPA's bills were not paid, they would have terminated the plan.

y. It was the controller's job to remit health insurance premiums to the health insurance providers and to reimburse the TPA, but the controller needed Browndorf's approval to make the payments. Browndorf determined when and how much to pay.

z. There were 401k contributions that were withheld from employee paychecks and never remitted to the plans. There were health insurance premiums withheld from employee paychecks and never remitted to the health insurance provider.

Browndorf knew about these issues and was responsible for deciding when to pay these obligations.

aa. Farenga and Rowland received emails from employees regarding their pay and benefits issues. Employees emailed and said their insurance card was denied at the doctor or they received a bill from the medical provider showing the services were not covered by insurance. Employees emailed Farenga asking when their paychecks were coming because they were behind on their personal bills or they had bank fees because their checks bounced. Browndorf was aware of these problems. Browndorf was copied on some of the emails and Rowland brought other emails to Browndorf's attention.

bb. Despite knowing about the issues with employee pay and benefits, Browndorf continued to take large draws from the businesses. Browndorf always put himself first. Browndorf would say this is a start-up company and the issues were just bumps in the road.

cc. Farenga generated the accounts payable aging report when he put together financial statements

53

to get funding for Plutos Sama.  This happened occasionally.  The accounts payable aging report showed that Plutos Sama was behind on paying almost everyone.  The rent payments for all the offices were delinquent and the rents payable stood out as a large amount.

dd.  The payroll tax liability was not on the accounts payable reports, but it was on the books as a separate liability.  Farenga did not recall the exact amount of the payroll tax liability, but it was over $1 million.

34. On 11/14/2019, 12/04/2019, and 08/06/2020, Plutos Sama employee Mack Oudin was interviewed by case agents. Oudin worked at the Plutos Sama office at 1900 Main Street in Irvine, CA.  Oudin was employed as a staff accountant at Plutos Sama from 2016 to 2019.  Oudin provided the following information during the interview, which does not include everything he provided:

a. Oudin, Jonathan Kuhn, and Christopher Gustavsson were the three staff accountants at Plutos Sama. They worked in the accounting department with the chief financial officer, Pat Farenga, and the controllers, Michele Stover and Brittney Rowland.  Matthew Browndorf was the owner and

54

chief executive officer of Plutos Sama. He controlled the activities of the accounting department and the finances. For all intents and purposes, Browndorf was the chief executive officer and chief financial officer of Plutos Sama and its subsidiaries.

b. Each staff accountant was assigned specific entities to work on and sometimes they switched the entities around between the accountants. They were tasked with inputting all journal entries for whichever entities they were assigned at that time.

c. The finances of Browndorf's businesses were treated as one large pot. Funds were frequently transferred between Plutos Sama and its subsidiaries. If funds were needed by one of the businesses, then funds were transferred from whatever business had enough funds to cover the need. Transfers between the businesses were booked as intercompany transfers in the accounting system. Oudin confirmed funds were transferred from BP Fisher to Plutos Sama to cover expenses.

d. Oudin was given authority to wire transfer funds from whatever business he was assigned to work at the time. He sent wire transfers from the businesses directly to Browndorf's personal accounts at Browndorf's direction or at the direction of Stover or Rowland. The personal transfers were booked to Browndorf's equity account in the accounting system. Oudin said there was a lot of money transferred to Browndorf's personal accounts while other employees were not getting their paychecks. Every day the accountants checked how much money was available in the accounts and part of that balance would have to be set aside to Browndorf.

e. Funds were indirectly transferred from BP Fisher and BP Peterman to Browndorf. A majority of these transfers originated from BP Fisher. Funds were transferred from BP Fisher and BP Peterman to Plutos Sama and then transferred from Plutos Sama to Browndorf. Oudin believes the funds were transferred this way to avoid showing owner's draws on the BP Fisher and BP Peterman books and records.

f. Oudin was the accountant primarily responsible for inputting the payroll journal entries into NetSuite for Plutos Sama and all of its subsidiaries. Chief Financial Officer Patrick Farenga assisted Oudin with creating the payroll accounts in NetSuite and setting up a template for uploading payroll reports into NetSuite.

g. Each pay period, Oudin downloaded the Payroll Journal reports for each of the Plutos Sama entities from Paycor's online portal. The Payroll Journal lists each employee, their earnings, payroll taxes, other deductions, and net pay. Then, Oudin formatted the Payroll Journals to upload into NetSuite. Oudin believed the Payroll Journals were formatted in .csv files and uploaded into NetSuite.

h. In 2018, Farenga instructed Oudin to keep and send him a periodic Excel spreadsheet summarizing each payroll period to show the wages, taxes, benefits, and other deductions. Oudin kept each payroll period on a separate tab of the Excel file. Farenga had Oudin create the Excel spreadsheet because Browndorf wanted it.

57

Oudin used payroll data from Paycor to create the spreadsheet.

i. The payroll tax liabilities on the books grew larger and larger over time. Farenga, Stover, Rowland, and Browndorf all knew the payroll taxes were not paid. Oudin was not in charge of paying the payroll, but he heard Farenga, Stover, Rowland, and Browndorf talking about the outstanding payroll tax liability.

j. Plutos Sama offered employees a 401k plan and Oudin contributed to it. In the beginning, the 401k was under the business name Wilson Keadjian Browndorf. Then the plan was switched over to Vanguard under the business Plutos Sama. 401k deductions taken out of Oudin's paychecks during the second half of 2018 were not paid by Plutos Sama into Oudin's 401k at Vanguard.

k. Farenga, Rowland, and Stover handled the Forms 941, Employer's Quarterly Tax Returns. Oudin observed them reconciling the Forms 941 to the payroll reports received from the payroll processor. Oudin did not know if the Forms 941 were filed, but he assumed they were. Oudin said the controller should be responsible for filing

the Forms 941, but at Plutos Sama Browndorf was responsible.   Browndorf controlled what was filed and what was not filed.

35. On 10/01/2020, Plutos Sama employee Victor Boyd was interviewed by case agents.  Boyd worked at the Plutos Sama office at 1900 Main Street in Irvine, CA.  Boyd was employed as the Chief Information Officer of Plutos Sama from 2015 to 2019.  Boyd provided the following information during the interview, which does not include everything he provided:

a. Boyd setup the IT infrastructure at Plutos Sama's 1900 Main St office to be enterprise ready. The network firewall was a pair of Cisco ASAs (Adaptive Security Appliances) for redundancy. The switching environment for the network was a Cisco 6509e chassis. The storage was on a SAN (Storage Area Network) and implemented through clustered NetApp storage devices. The servers were virtualized using VMWare and physically ran on HP blades which provided the CPUs and memory for the virtual servers.

b. Boyd setup full backups to run in the evenings. One backup was performed on premises to NAS devices (Network Attached Storage) and then those backups were also backed up to the cloud

59

using Amazon's AWS.

c. Boyd setup on premises, local Microsoft exchange
virtual servers for email. No email was in the
cloud while Boyd was employed, but the plan was
to eventually transition email to the cloud.
Documents or file storage was hosted in the cloud
using Microsoft Office 365 or Microsoft One
Drive. Boyd also performed backups on the One
Drive data.

d. Boyd also setup a duplicate IT infrastructure[3]
at the TelePacific datacenter located at 2001 E
Dyer Road in Santa Ana, CA. This datacenter is
SOC 2 compliant[4]. Boyd leased equipment and cage
space at TelePacific and had one rack containing
the IT infrastructure. It was a full hot DR

---

[3] Duplicate IT infrastructure – Boyd said the IT
infrastructure at TelePacific was a duplicate of the
infrastructure at 1900 Main Street in Irvine, CA. This
means all of the files, emails, and backups that were
stored at 1900 Main Street were also stored at the
TelePacific.
[4] SOC 2 compliant – SOC 2 is an auditing process testing
principle of security, availability, processing integrity,
confidentiality, and privacy to ensure data is securely
managed, client privacy is protected, and organizational
interests are protected. For an organization to be SOC 2
compliant means that there has been an outside audit and
the organization has met the requirements.

(disaster recovery) site[5] for Plutos Sama's 1900 Main St location.  Boyd could not recall which cage Plutos Sama leased.

e. All backups were encrypted; however, Boyd could help unencrypt them.  Boyd does not have any of the passwords to the Plutos Sama servers.  His protocols are to destroy his passwords when he leaves a company because of liability concerns.

f. Boyd believes Plutos Sama's duplicate IT infrastructure is still at TelePacific's Santa Ana datacenter. About 5 or 6 months ago, Boyd received a phone call from TelePacific asking him what he wanted them to do with Plutos Sama's IT equipment.  Boyd declined to give them directions and referred them to Browndorf.

g. All of the businesses operated by Plutos Sama were run from the IT infrastructure at the 6th floor office at 1900 Main Street and the IT infrastructure at TelePacific.  Boyd said the Plutos Sama infrastructure ran in multiple locations simultaneously and employees could

---

[5] Full hot disaster recovery site – This is a remote site that allows a business to continue complete computer and network operations in the event of a computer or equipment disaster.

access other sites remotely. This includes BP Peterman Law Group in the Midwest and BP Fisher Law Group on the East Coast once they were acquired by Plutos Sama.

h. There was an IT infrastructure in Brookfield, WI, for BP Peterman. The BP Peterman legacy files were stored there. Boyd pulled data off the Brookfield servers and backed up the data to the TelePacific datacenter.

i. The BP Peterman and BP Fisher emails were on the servers at TelePacific.

j. The IT infrastructure Boyd setup for Plutos Sama remained significantly the same throughout his employment at Plutos Sama.

k. Boyd worked as the CIO for Plutos Sama until February 15, 2019 when he resigned. Boyd resigned for numerous reasons including the following: At the point he resigned, Boyd had not been paid his wages in 6 months. His child support payments were being withheld from his paychecks, but they were not being paid. Lots of people had resigned, Boyd had heard some troubling things from employees, and he wasn't getting the answers he wanted. Boyd heard

employees' 401k accounts were not being funded
and at the same time Browndorf was taking
helicopter trips and lavish vacations. Boyd
heard that client trust funds had disappeared.
He confronted Browndorf about it and Browndorf
responded by asking, "Who is telling you that?"
Boyd also confronted Browndorf after he heard
health benefits were not being paid. Browndorf
said the health benefits were paid.

l. Browndorf controlled everything at Plutos Sama.
He was 100% in control of the finances. The
controller, Michele Stover, and the Chief
Financial Officer, Pat Farenga, were just
Browndorf's pawns. Browndorf made the financial
decisions.

m. Boyd said Browndorf was not paying payroll, yet
he was taking trips to Switzerland and taking
helicopter trips to LAX because he did not want
to drive to the airport.

n. Even though Boyd had the title of CIO, Browndorf
did not treat him like a CIO. For all intents
and purposes Boyd was just an IT employee.

o. Browndorf had multiple email addresses for his
various businesses. He had a Plutos Sama email,

Distressed Capital Management email, WKB email, BP Law email, a personal gmail account for his phone, and others. Browndorf often used mcbrowndorf@plutossama.com. Boyd would email Browndorf, but Browndorf would not email him back. Browndorf would bring Boyd into his office to discuss things instead of putting them in writing.

p. Boyd is still owed approximately $30,000 of 2018 and 2019 back wages from Plutos Sama. This represents his net pay after tax and other withholdings. Boyd is also owed for 80 hours of PTO (paid time off).

q. Boyd had health insurance through Plutos Sama and health insurance premiums were deducted from his paychecks. They had multiple health insurance plans. One was through Leading Edge because Browndorf knew one of the principals there. The Leading Edge plan was retroactively canceled due to non-payment. They also had a plan through United Healthcare. Boyd had to pay approximately $1,000 to $1,500 of medical bills out of pocket that should have been covered by his insurance. In 2019 after the Leading Edge

64

insurance plan was terminated, Browndorf pulled everyone into the conference room and said he was sorry and he was going to fix the health benefits.

**NetSuite Records**

36. Case agents subpoenaed NetSuite, a cloud based accounting software, for the accounting records of Plutos Sama and its related entities. The NetSuite records provide details regarding payroll, draws, and other pertinent transactions related to the finances of Plutos Sama and its related entities.

37. The affiant analyzed Equity account 31000 titled, Partner 1 Equity, from the Plutos Sama NetSuite records. This account documents over 1,100 transactions between 01/01/2017 and 12/28/2018. The transactions primarily involve Browndorf's personal use of credit cards and business bank accounts. For example, based on subpoenaed bank records from Spring Bank, BP Peterman operating account 10000511 was used to write check 184528, dated 12/03/2018, for $25,000 listing the payee as Matthew Browndorf. This check is accounted for as a decrease to the Partner 1 Equity account in the NetSuite records. The withdrawals Browndorf made from business accounts are also known as owner draws. On 12/28/2018, the Partner 1 Equity account had a final balance of $7,283,532.63,

indicating Browndorf had taken significant net draws from the Plutos Sama related entities. This balance includes over $2.4 million of draws in 2017 and $2.3 million of draws in 2018, both of which were periods when crucial bills were not being paid by the businesses.

38. The affiant analyzed liability account 24210 from the Plutos Sama NetSuite records. This account is titled, Payroll and Federal Payroll Tax Liabilities. This account documents the federal payroll tax liabilities for the Plutos Sama related entities in 2017 and 2018. Typically, at the end of each month the federal payroll taxes were cleared from this account and transferred to liability account 23563 titled, Loan to BHLT. The state payroll tax account was treated similarly. On 06/30/2018, the Loan to BHLT account had a final balance of $3,893,986.44. Based on my training and experience, it appears that the Loan to BHLT account was used to conceal the mounting payroll tax liabilities of the Plutos Sama related entities as a loan to an unknown party.

**U.S. TelePacific Corp dba TPx Communications Records**

39. Case agents subpoenaed U.S. TelePacific Corp dba TPx Communications (TelePacific) for records involving Plutos Sama and its related entities. On November 10, 2020, TelePacific responded to the subpoena and stated that Plutos Sama's equipment is currently located in cabinet A7, at the

66

TelePacific datacenter at 2001 E Dyer Road in Santa Ana, CA 92705.

**The Email Accounts**

40. On March 5, 2019, I received an email message from Sara Stangel, the former Human Resources Director at Plutos Sama. Stangel, in that email, told me that the following individuals were key officers and employees of Plutos Sama and had the respective email address indicated in parenthesis:

- Matthew Browndorf (mcbrowndorf@plutossama.com);

- Patrick Farenga (pfarenga@plutossama.com);

- Michele Stover (mstover@plustossama.com);

- Brittney Rowland (browland@plutossama.com); and,

- Mack Oudin (moudin@plutossama.com).

**COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

41. Based on my training, experience, and information from those involved in the forensic examination of digital devices[6], I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

---

[6] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming

a. Forensic methods may uncover electronic files or
remnants of such files months or even years after
the files have been downloaded, deleted, or
viewed via the Internet.  Normally, when a person
deletes a file on a computer, the data contained
in the file does not disappear; rather, the data
remain on the hard drive until overwritten by
new data, which may only occur after a long
period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into
a temporary directory or cache that are only
overwritten as they are replaced with more
recently downloaded or viewed content and may
also be recoverable months or years later.

b. Digital devices often contain electronic
evidence related to a crime, the device's user,
or the existence of evidence in other locations,
such as, how the device has been used, what it
has been used for, who has used it, and who has
been responsible for creating or maintaining

_____

consoles; peripheral input/output devices, such as
keyboards, printers, scanners, monitors, and drives;
related communications devices, such as modems, routers,
cables, and connections; storage media, including computer
servers; and security devices.

records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement

69

continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

42. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte

70

can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

43. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

44. Based upon the facts set forth above, I respectfully request that a search warrant be issued authorizing the search of the material described in Attachment A for items described in Attachment B, which constitute evidence, fruits, and instrumentalities of the criminal offenses described in this Affidavit.

```
                                    _____
                                    ZACHARY E. STEGENGA
                                    Special Agent
                                    Internal Revenue Service,
                                    Criminal Investigation
```

Attested to by the applicant
in accordance with the
requirements of Fed. R. Crim.
P. 4.1 by telephone on this
_____ day of April, 2021.


```
_____
UNITED STATES MAGISTRATE JUDGE
```

**ATTACHMENT A**

This warrant applies to information associated with certain email addresses (mcbrowndorf@plutossama.com; pfarenga@plutossama.com; mstover@plustossama.com; browland@plutossama.com; and moudin@plutossama.com), which are stored at Cabinet A7, U.S. TelePacific Corp dba TPx Communications Datacenter at 2001 East Dyer Road, Santa Ana, California 92705.

A portion of the relevant Cabinet follows below:



**ATTACHMENT B**

**Particular Things to be Seized**

**I.   Information to be initially obtained**

Law enforcement is authorized to obtain, for each account or identifier listed in Attachment A:

a.     The contents of all emails associated with each account starting from 2016 to the present, including stored or preserved copies of emails sent to and from each account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.     All records or other information regarding the identification of each account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.     All records and other information regarding the types of email service utilized; and,

74

d.   All records or other information stored by an individual using each account, including address books, contact and buddy lists, calendar data, pictures, and files.

**II.  Information to be seized**

Law enforcement is authorized to seize all information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of Title 26, United States Code, Sections 7201 and 7202, and Title 18, United States Code, Sections 371, 664, and 669, involving Matthew Browndorf, Plutos Sama, LLC, LF Runoff 2, LLC, Plutos Sama Employment Services, LLC, Plutos Sama Client Services, LLC, OC Legal Services, LLC, Wilson Keadjian Browndorf, LLP, BP Peterman Law Group, LLC, or BP Fisher Law Group, LLC, those violations occurring after January 1, 2016, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.   Records, documents, programs, applications and materials relating to any and all federal and state income, employment, payroll, excise and sales tax returns, whether filed with the IRS or not, tax return information including any work papers used in the preparation of the returns and any correspondence with accountants or return preparers, any

75

tax return schedules and forms, payroll records, Forms W-2, Forms W-3, and Forms 1099;

b.      Records, documents, programs, applications and materials relating to any and all payroll and employment records including documents reflecting the names, street addresses, phone numbers, other personal identification information, and correspondence of all employees, payroll journals, employment agreements, and any other records reflecting the methods used to pay employees, the wage amounts paid, hours worked, and taxes withheld from wages;

c.      Records, documents, programs, applications and materials relating to any and all 401(k) employee benefit program records including all plan sponsor and participant applications, contracts, agreements, amendments, contribution and investment statements, lists of participants, notices, delinquency statements, records disclosing plan administrators and trustees, their contact information, and roles, records of remittances to the plans, loans, communications, and correspondence;

d.      Records, documents, programs, applications and materials relating to any and all employee health benefit program records including plan applications, contracts, agreements, amendments, summaries of benefits and coverage, lists of participants, payment records, billing records,

76

documentation relating to claims, delinquency notices, plan terminations, communications, and correspondence;

e.      Records, documents, programs, applications and materials relating to any and all personal and business accounting books and records: ledgers, journals, subsidiary ledgers, financial statements, gross receipts and income records, cash receipts and disbursements records and/or journals, sales and purchase records and/or journals, accounts receivable and payable ledgers and records, bad debt records, cost of goods sold records, loan receivable and payable ledgers, voucher register and all sales and expense invoices including all invoices documenting expenses paid in cash or bank checks and retained copies of any bank checks, and any other handwritten summaries/notes or schedules;

f.      Records, documents, programs, applications and materials relating to any and all personal and business financial records reflecting income and expenses including: bank statements, records reflecting dates and amounts of deposits, deposit slips, records reflecting dates and amounts of withdrawals, withdrawal slips, debit and credit memos, records reflecting the identity of checks deposited, records disclosing the disposition of withdrawals, check registers, checks and deposit tickets including cash deposits, certificates of deposit, money market certificates, US

Treasury notes or bills, cancelled checks (front and back), check stubs, money orders and receipts, cashier's checks, travelers checks, wire transfers, records reflecting the transfer of funds, bank notices, trust account records, brokerage account records, signature cards, foreign bank records, and any other records relating to bank accounts;

g.     Records, documents, programs, applications and materials relating to any and all documents and items evidencing the obtaining, secreting, transfer, and/or concealment of assets and expenditure of money; and,

h.     Records, documents, programs, applications and materials relating to any and all IRS publications, regulations, and/or copies of IRS forms and documents; extracts from the Internal Revenue Code; and any correspondence relating to IRS forms, Internal Revenue Statutes or regulations and tax schedules.

**III. Search Procedure**

1.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic

78

image(s) thereof to an appropriate law enforcement laboratory
or similar facility to be searched at that location.  The
search team shall complete the search as soon as is
practicable but not to exceed 120 days from the date of
execution of the warrant.  The government will not search the
digital device(s) and/or forensic image(s) thereof beyond
this 120-day period without obtaining an extension of time
order from the Court.

b.    The search team will conduct the search only
by using search protocols specifically chosen to identify
only the specific items to be seized under this warrant.

i.    The search team may subject all of the
data contained in each digital device capable of containing
any of the items to be seized to the search protocols to
determine whether the device and any data thereon falls within
the list of items to be seized.  The search team may also
search for and attempt to recover deleted, "hidden," or
encrypted data to determine, pursuant to the search
protocols, whether the data falls within the list of items to
be seized.

ii.    The search team may use tools to exclude
normal operating system files and standard third-party
software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the

80

time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

2.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

3.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary

82

to access the digital device or data stored on the digital device.

4.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

5.    The review of material seized by law enforcement pursuant to this warrant shall be further governed by the procedures enumerated in Exhibit 1, the March 1, 2021 Memorandum from the United States Attorney's Office for the Eastern District of Wisconsin entitled "2019R00134, Filter Team Instructions, Telepacific Server."

# Exhibit 1

# Memorandum

*United States Attorney's Office*
*Eastern District of Wisconsin*

| Subject | Date |
| --- | --- |
| 2019R00134<br>Filter Team Instructions<br>TelePacific Server | March 1, 2021 |
| **To** | **From** |
| AUSA Pete Smyczek | AUSA Kevin Knight |



## <u>INTRODUCTION</u>

Target Matthew Browndorf ("Browndorf"), an attorney, utilized his holding company Plutos Sama, LLC ("Plutos Sama") to purchase various smaller law firms across the country.

Law enforcement currently believes that Browndorf willfully failed to truthfully account for and pay federal employment taxes related to these entities; stole, embezzled, or unlawfully and willfully abstracted or converted to his own use moneys, funds, securities, premiums, credits, property, or other assets from a related employee benefit plan called the Plutos Sama 401(k) Plan at The Vanguard Group, Inc.; and, knowingly and willfully stole, embezzled, or otherwise without authority converted to his own use the moneys, funds, securities, premiums, credits, property, or other assets of the associated 2018 health care benefit program called the Plutos Sama Employee Services, LLC plan at Leading Edge Administrators.

As part of its investigation into this conduct, law enforcement has sought to review electronic evidence associated with Plutos Sama's operations. This effort was initially complicated by the fact that in early 2019, Plutos Sama changed its legal name and initiated Chapter 11 bankruptcy proceedings in the Central District of California.

Since that time, Plutos Sama's former Chief Information Officer has described to law enforcement how Plutos Sama maintained a "duplicate IT infrastructure" at the datacenter located at 2001 E Dyer Road in Santa Ana, CA, maintained by U.S. TelePacific Corp d/b/a TPx

Filter Team Instructions
Page 2
_____

Communications ("TelePacific"). This "duplicate IT infrastructure" was designed to ensure that any electronic files and emails available at Plutos Sama's former headquarters would be similarly maintained on TelePacific's servers.

Investigators have accordingly drafted a search warrant, warrant application and supporting affidavit (the "Subject Warrant Package") that would give them legal authority to search the TelePacific servers hosting Plutos Sama's data, in an effort to search and seize evidence of violations of Title 26, United States Code, Sections 7201 (tax evasion) and 7202 (willful failure to pay tax), and Title 18, United States Code, Sections 371 (conspiracy), 664 (theft or embezzlement from employee benefit plan subject to Title I of ERISA), 669 (theft or embezzlement from a health benefit program), and 1343 (wire fraud).

The purpose of these instructions is to protect the various attorney-client and work-product privileges that may be associated with the data to be seized from TelePacific's servers. These instructions are further designed to prevent the disclosure of privileged and/or otherwise protected attorney-client information to case agents, investigators, and prosecutors assigned to the investigation, and to ensure that we effectively document our efforts on this score. Throughout this document, all references to "presumptively protected" material should be construed to include all communications between any attorney and Browndorf, regardless of whether such material otherwise appears to meet the requirements for establishing a privilege.

To prevent such disclosure and the potential taint of investigators and prosecutors assigned to the case, the Internal Revenue Service and the United States Attorney's Office for the Eastern District of Wisconsin have designated a "Filter Team" to collect and review potentially protected material produced seized and/or produced related to the Subject Warrant Package.

Filter Team Instructions
Page 3

———————————————————————

This Filter Team will be comprised of (i) Assistant United States Attorney Peter Smyczek; (ii) a not-yet-specified Special Agent of the Internal Revenue Service, Criminal Investigation, who is qualified in the field of forensic collection of electronic evidence and will be principally responsible for the initial execution of the Subject Warrant Package and related logistical tasks; and (iii) a not-yet-specified Special Agent of the Internal Revenue Service, Criminal Investigation, who will be principally responsible for reviewing data collected and generated after execution of the Subject Warrant Package.

The Filter Team serves a privilege screening function only; they are not designed to and will not review information for discoverability under criminal discovery rules and case law. Filter Team members will not be involved with the primary investigation, in any way, and may not have any further role in the investigation or prosecution of this case, unless some further privilege issue arises requiring additional review. Members of the Filter Team are prohibited from discussing with any investigator or prosecutor assigned to this case, or any other person not assigned to the Filter Team, any protected information they learn as a result of their assignment to this Filter Team.

Filter Team members must be familiar with the Subject Warrant Package, including but not limited to the relevant warrant, the application for the warrant, and all affidavits or attachments thereto. All of these documents will be separately provided to the Filter Team. Members of the Filter Team and the Prosecution Team must also review and understand these instructions and the list of the attorneys and/or law firms that are known or believed to represent or have represented Browndorf. If you have any questions about these instructions at any time during this process, you should consult as a Filter Team before you proceed further.

Filter Team Instructions
Page 4
_____

       This memorandum and the instructions below relate to the process and procedure to

identify, segregate, and ultimately dispose of protected materials contained in the items seized.

The instructions contained in this memorandum are in addition to any procedures outlined in

Subject Warrant Package or other legal process.  The Filter Team should be familiar with and,

where applicable, follow both the instructions contained in this memorandum and any

procedures set forth in the Subject Warrant Package or any other legal process.

<b><u>INSTRUCTIONS TO THE FILTER TEAM</u></b>

**A.**      <u>**Overview**</u>

       1.     The Internal Revenue Service will designate a Special Agent who will assist in

the execution of the warrant contained in the Subject Warrant Package (the "Forensic Agent").

This Forensic Agent will conduct on-site triage of the search of TelePacific's servers. After the

on-site triage (if any) is completed, the original electronic storage devices seized from

TelePacific will be placed in secure containers, stored in a secure evidence location, and clearly

labeled as containing potentially protected material.  These secure containers must not be opened

absent approval from the Filter Team AUSA.  After the Filter Team has isolated material that

can be appropriately disseminated to the Prosecution Team, pursuant to the procedures outlined

herein, the Forensic Agent then will save this same material on some form of new digital media

(collectively "New Media").  The Forensic Agent will then provide the New Media to the

Prosecution Team.  This process can be completed on an iterative or "rolling" basis. The

Forensic Agent may not be reassigned to the Prosecution Team at any time after participating in

the filter process.  As part of their review, the Filter Team AUSA and Filter Agent may enlist the

Forensic Agent for additional forensic and technical assistance.

Filter Team Instructions
Page 5

2.      The Internal Revenue Service will also designate a second Special Agent (the

"Filter Agent") who will assist in the analysis of the items and information seized in the

execution of the Subject Warrant Package; identify potentially protected and non-protected

information; and assist in the segregation of all presumptively protected information, as further

explained below.

3.      The United States Department of Justice has designated Assistant United States

Attorney Peter Smyczek as the Filter Team AUSA who will review materials identified by the

Filter Agent and ensure the appropriate disposition of the same, as further explained below.

4.      Filter Team members may not reveal or discuss the contents of any document, file

or item determined to contain presumptively protected or potentially protected material to any

other person, except counsel for the appropriate defendant, unless otherwise ordered by the court.

Attached to these instructions is a list of investigative agents and prosecutors on the Prosecution

Team to prevent any inadvertent disclosure.

**B.      General Principles for Review by the Filter Team**

1.      Investigative agents on the Prosecution Team intend to search and seize

computers, servers, digital devices, and other information as outlined in the Subject Warrant

Package.  Before any member of the Prosecution Team may review the items seized, those items

will be reviewed by the Filter Agent who will be responsible for making the initial determination

as to whether any of the seized items contain protected information.

2.      In all instances, in making the initial determination as to whether a device,

document or item contains protected information, the Filter Team and the Prosecution Team

should err on the side of caution and treat any questionable item as potentially protected material

Filter Team Instructions
Page 6
_____

and comply with these instructions. The Filter Team AUSA will make the final determination

regarding any designation.

**C.    <u>Specific Guidance for Review by the Filter Team</u>**

1.    Any digital devices, including computers, servers, hard drives, disk drives, CDs,

DVDs, floppy disks, thumb drives, and other data storage media, including cellular phones and

devices (collectively referred to as "digital devices") seized pursuant to the Subject Warrant

Package shall be "imaged" or copied by the Forensic Agent.  The original seized digital devices

and their images should then be placed in a sealed container(s), which should not be opened by

any one absent approval from the Filter Team AUSA.  The items should be labeled: "Contains

potentially protected material."  The Forensic Agent shall not access or review any of the digital

devices, or their image or copy, unless authorized by and consistent with these instructions.  A

report documenting the process used to image any digital device shall be prepared by the

Forensic Agent and provided to the Filter Team AUSA, who will eventually forward it to the

prosecutor assigned to the Prosecution Team.

2.    After a forensic image of any digital device is created, in order to identify

protected communications, the Filter Agent may then access the image and review the same. As

the Filter Agent reviews the materials from any digital device, the Filter Agent will sort the

material as follows: (1) "presumptively protected"; (2) "potentially protected"; or (3) "non-

protected." The Filter Agent must maintain a log of all material reviewed, identifying the

material by type, the digital device on which the item was located , the file name, the type of file,

the file's creation date, the file's date sent/sender/recipient (if appliable), the subject matter, and

Filter Team Instructions
Page 7
_____

the Filter Agent's designation of each item (i.e. non-protected, potentially protected, or

presumptively protected).

      3.     After data or material is designated as "non-protected" by the Filter Agent, the

Filter Agent should forward that same data or material to the Filter Team AUSA. The Filter

Team AUSA will review and separately designate the data or material as containing non-

protected material. After confirming this designation, the Filter Team AUSA will work with the

Forensic Agent to ensure that an image or copy of this same non-protected material is produced

to the Prosecution Team. If the Filter Team AUSA believes that the Filter Agent has designated

any data or material as "non-protected" in error, that same data or material should be analyzed by

the Filter Team AUSA pursuant to the procedures outlined below for material designated as

"presumptively protected" or "potentially protected."  The Filter Team AUSA should also notify

the Filter Agent of this development and remind the Filter Agent of the operative standards and

presumptions outlined herein.

      4.     After data or material is designed as "presumptively protected" or "potentially

protected" by the Filter Agent, the Filter Team AUSA will further segregate that same data or

material into four categories: (1) "not protected"; (2) "protected and cannot be redacted"; (3)

"protected but can be redacted"; and (4) "potentially protected" (e.g., the government does not

have sufficient information to make that determination, or an exception to the applicable

protection, such as crime-fraud or waiver by disclosure to a third party, may apply).

      5.     With respect to data or material in category 1 that is otherwise subject to seizure

under the Subject Warrant Package: the Filter Team AUSA will work with the Forensic Agent to

Filter Team Instructions
Page 8
_____

ensure that an image or copy of this same non-protected material is produced to the Prosecution

Team.

6.      With respect to data or material in category 2 and any data or material that the

Filter Team AUSA deems to be not subject to seizure under the Subject Warrant Package: the

Filter Team AUSA shall seal this data or material in a separate container(s) or medium and

return this data or material to TelePacific, the privilege holder or counsel for the privilege holder

as soon as practicable given the status of the investigation.

7.      With respect to data or material in categories 3 and 4 that is otherwise subject to

seizure under the Subject Warrant Package: the Filter Team AUSA shall end a copy of the

material in categories 3 (with proposed redactions) and 4 (collectively, the "Privilege Review

Material"), along with the bases for determinations that any potentially protected materials are

subject to an exception, to counsel for Browndorf, along with a log of relevant information

sufficient to facilitate a meaningful discourse with the same.  The Filter Team AUSA will work

with counsel for Browndorf to try to reach an agreement as to whether the Privilege Review

Material: (1) falls within an exception to the applicable protection, or (2) can be redacted to

eliminate the protected information.  If the Filter Team AUSA and counsel for Browndorf cannot

agree on these determinations, the Filter Team AUSA will submit those items to the court for

determinations regarding protection and/or proposed redactions of the material. The Filter Team

AUSA only will provide Privilege Review Material to the Prosecution Team if: (i) the Filter

Team AUSA and counsel for Browndorf reach an agreement as to the particular item; or (ii) the

court has ruled that the Filter Team AUSA may provide the item to the Prosecution Team.  No

Filter Team Instructions
Page 9

member of the Filter Team shall disclose the contents of any Privilege Review Material to any

member of the Prosecution Team, except in accordance with this procedure.

8.      The Filter Team AUSA must maintain a log of all material reviewed, identifying

the material by type, the digital device on which the item was located, the file name, the type of

file, the file's creation date, the file's date sent/sender/recipient (if appliable), the subject matter,

the Filter Agent's original designation of each item (i.e. non-protected, potentially protected, or

presumptively protected), the Filter Team AUSA's designation of each item (i.e., not protected,

protected and cannot be redacted, protected but can be redacted, or potentially protected), the

results of any consultation or review procedure with respect to each item, and the ultimate

disposition of each item.

9.      If, despite the procedures outlined in this memo, a member of the Prosecution

Team finds, in the items provided by the Filter Team, any tangible, documentary, or electronic

data that appears to contain protected or potentially protected information, they will not examine

it further, and will immediately notify the Filter Agent who will take custody of the material in

question, notify the Filter Team AUSA, and review the material according to these instructions.

**D.      Consultation With Investigative Agents or Prosecutors**

During the review process, the Filter Agent or Filter Team AUSA may consult with the

investigative agents or prosecutors on the Prosecution Team concerning the facts of the

investigation, the legal elements of the attorney-client or work product privileges, the scope of

any search warrant, the appropriateness of the seizure of any document, file, or item, or any other

factual or legal question.  Filter Team members may not disclose the substance of any potentially

or presumptively protected item to any investigative agent or prosecutor unless the item is finally

Filter Team Instructions
Page 10
_____

determined not to be protected, consistent with these instructions, and may otherwise be

disclosed to the Prosecution Team.

**E.    <u>Applicable Legal Standards</u>**

In reviewing items pursuant to these instructions, the Filter Agent and Filter Team AUSA

should err on the side of caution, and treat any questionable items as protected.  In addition:

- Filter Team members should know and refer to the list of attorneys and/or law firms known or believed to have represented Browndorf, attached to these instructions.

- Filter Team members should treat as presumptively protected any letter, e-mail, memorandum, or other document containing a communication between Browndorf and one of his attorneys (or his attorney's staff, agents, or employees).

- Filter Team members should treat as presumptively protected any letter, e-mail, memorandum, or other document containing a communication between Browndorf and one of his clients (or his client's staff, agents, or employees).

  NOTE: Law enforcement does not believe Browndorf was practicing law during the relevant time period, such that documents between Browndorf and any clients should not be collected pursuant to the Subject Warrant Package. The above notation is only made from an abundance of caution.

- Filter Team members should treat as presumptively protected all materials prepared by an attorney (or their staff, agents, or employees) during the course of or in preparation for any investigation or litigation in which Browndorf was involved.

Filter Team members should also be familiar with the legal elements of the attorney-

client privilege and the attorney work product privilege.  While the United States Attorney's

Office for the Eastern District of Wisconsin has decided to take an expansive view of what

constitutes protected material, particular care should be given to material that falls within the

attorney-client privilege and work product doctrines, set forth below.

Filter Team Instructions
Page 11
_____

**1.    The Attorney-Client Privilege**

The attorney-client privilege applies "(1) When legal advice of any kind is sought, (2) from a professional legal adviser in his or her capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are, at the client's instance, permanently protected, (7) from disclosure by the client or by the legal adviser, (8) unless the protection be waived." United States v. Martin, 278 F.3d 988, 999 (9th Cir. 2002). (citations omitted). Thus, for the privilege to apply there must first be an attorney-client relationship. Id. at 1000. In the case of corporate counsel, the corporation's privilege "does not extend automatically" to a corporate officer "in his individual capacity." Id. Next, "the communication must be between the client and lawyer for the purpose of obtaining legal advice." Id. Thus, for example, where corporate counsel participates in making *business* decisions, based upon his business judgment as opposed to his legal knowledge, communications concerning those business decisions may not be protected. In determining the purpose of a lawyer's action:

> there is a rebuttable presumption that the lawyer is hired 'as such'
> to give 'legal advice,' whether the target of the advice is criminal
> or civil, business, tort, domestic relations, or anything else. But the
> presumption is rebutted when the facts show that the lawyer was
> 'employed without reference to his knowledge and discretion in
> the law.'

United States v. Chen, 99 F.3d 1495, 1501 (9th Cir. 1996).

**2.    The Attorney Work Product Privilege**

The work product privilege, codified in Federal Rule of Civil Procedure 26(b)(3), protects from discovery "documents and tangible things prepared by a party or his representative in anticipation of litigation." In re Grand Jury Subpoena (Mark Torf/Torf Environmental

Filter Team Instructions
Page 12

Management), 357 F.3d 900, 906 (9th Cir. 2004) (internal quotation marks and citation omitted).

The work product privilege is narrower than the attorney-client privilege, and is more akin to a

limited or qualified privilege.  Documents protected as work product may still be discoverable,

but only upon a showing of substantial need for the materials and undue hardship in obtaining

their substantial equivalent by other means.  Id. (quoting Fed. R. Civ. P. 26(b)(3)).

        To qualify as protected work product, "documents must have two characteristics:  (1)

they must be prepared in anticipation of litigation or for trial, and (2) they must be prepared by or

for another party or by or for that other party's representative."  Id. at 907 (internal quotation

marks and citation omitted).  Materials prepared by investigators, experts, paralegals, or other

agents of the attorney in anticipation of litigation or in preparation for trial are protected by the

work product privilege as well.  Id., (citing United States v. Nobles, 422 U.S. 225, 238-29

(1975)).

        Sometimes, documents may be prepared for some purpose in addition to anticipated

litigation.  In determining whether such "dual purpose" documents are protected work product,

the Ninth Circuit employs a "because of" test:

            a document should be deemed prepared 'in anticipation of
            litigation' and thus eligible for work production protection . . . if in
            light of the nature of the document and the factual situation in the
            particular case, the document can be fairly said to have been
            prepared or obtained because of the prospect of litigation.

In re Grand Jury Subpoena, 357 F.3d at 907 (internal quotation marks and citation omitted).  The

"because of" test "does not consider whether litigation was a primary or secondary motive

behind the creation of a document;" rather, it considers "the totality of the circumstances and

affords protection when it can fairly be said that the document was created because of anticipated

Filter Team Instructions
Page 13
_____

litigation, and would not have been created in substantially similar form but for the prospect of

that litigation."  Id. at 908 (internal quotation marks and citation omitted).

      Of particular importance in reviewing potentially protected work product is the protection

of the mental impressions or opinions of any of the defendants' lawyers.  In fact, even where

work product may otherwise be discoverable, Rule 26(b)(3) requires the court to "protect against

disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or

other representative of a party concerning the litigation."  Thus, any document or file that

contains the thoughts or opinions of an attorney about actual or anticipated criminal or civil

litigation must be protected from disclosure to investigating agents and prosecutors.

Filter Team Instructions
Page 14

**ATTORNEYS AND LAW FIRMS KNOWN OR SUSPECTED TO BE REPRESENTING SUBJECT MATTHEW BROWNDORF**

Attorney Daniel Layton

Attorney Josh Robbins

Attorney Peter Hardin

Attorney Marc Forsythe

Goe Forsythe & Hodges LLP

Greenberg Gross LLP

Buchalter Law Firm

Hardin Law Firm

**THE PROSECUTION TEAM**

AUSA Kevin Knight

AUSA Matt Jacobs (retired)

SA Zachary Stegenga (IRS)

Senior Benefits Investigator David Larson (DOL)